# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# PINE BLUFF DIVISION

EARLIE D. RUTH                                                         PLAINTIFF

v.                              No. 5:05CV00345 JLH

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION                          DEFENDANT

## OPINION

Earlie D. Ruth challenges the final decision of the Commissioner of the Social Security Administration denying his claim for disability insurance benefits under Title II of the Social Security Act for the period of July 15, 1992, through November 5, 1996. For the following reasons, the decision of the Commissioner is affirmed.

## I.

The Social Security regulations provide a five-step process to determine whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987). The first step is to determine whether the claimant is involved in substantial gainful activity. 20 C.F.R. §§ 404.1520(b); 416.920(a)(4)(i). If not, the second step is to determine whether the claimant has a severe impairment or combination of impairments. *Id.* §§ 404.1520(c), 416.920(a)(4)(ii). The third step is to determine whether the impairments meet or equal a listed impairment that is presumed to be disabling. *Id.* §§ 404.1520(d), 416.920(a)(4)(iii). If so, benefits are awarded; if not, the evaluation proceeds to step four in which it must be determined whether the claimant has sufficient residual functional capacity to perform his past work. *Id.* §§ 404.1520(e)-(f), 416.920(a)(4)(iv). If the claimant is unable to do so, the question

at step five is whether the claimant is able to perform other substantial and gainful work within the economy, given the claimant's age, education, and work experience. *Id.* §§ 404.1520(g), 416.920(a)(4)(v).

## II.

Ruth was born on November 5, 1941. He was employed by the Arkansas Highway Department for almost twenty years. His work consisted of operating a road grader and other manual labor. He had an eleventh grade education. On July 15, 1992, Ruth filed an application for disability insurance benefits under Title II of the Social Security Act. He alleged that he had been totally disabled since October 18, 1991. That claim was denied on March 22, 1992. The disability determination form dated March 23, 1992, listed "herniated nucleus pulposus status post operative" as Ruth's only health condition relevant to the determination to deny benefits.

Ruth filed a second application on July 14, 1993. Ruth alleged the onset of disability on that application as July 15, 1992. He alleged that the disability was due to pain, back problems, high blood pressure, and right leg dysfunction. An administrative law judge held a hearing on Ruth's second application on November 21, 1994. The ALJ denied Ruth's claim on August 3, 1995. Ruth appealed the ALJ's decision to the appeals council, but the appeals council denied review on November 22, 1996.

Ruth then filed a third application under Title II on December 17, 1996, again alleging the onset of disability to be July 15, 1992. An ALJ issued a partially favorable decision on October 16, 1998. The ALJ found that Ruth was entitled to benefits beginning November 5, 1996 – Ruth's fifty-fifth birthday – because he met the requirements of Grid Rule 202.02, which directs that an individual is disabled if he is fifty-five years old, has a limited education, and is able to perform only

light work. The ALJ denied benefits for the period prior to November 5, 1996, holding that Ruth did not have a "severe impairment" and therefore failed to meet step two of the five-step process. Ruth filed suit in federal court challenging the ALJ's partially favorable decision. This Court reversed and remanded.

The ALJ held another hearing and, on August 21, 2000, issued another decision denying benefits, this time finding that Ruth retained the residual functional capacity to perform light work. Ruth sought review of that decision by the appeals council. The appeals council remanded the case to the ALJ to evaluate further Ruth's subjective complaints and to perform a more detailed assessment of Ruth's ability to do work-related physical activities for the period of time from July 15, 1992, to November 5, 1996.

A new ALJ was assigned to Ruth's case and a hearing held on November 6, 2002. At that hearing, Ruth testified that he could not sit or stand for more than twenty minutes before having to move to another position to get relief from the pain. Ruth also testified that he had a heart condition that caused pain and shortness of breath. In addition to the back and chest pain, Ruth testified that his high blood pressure caused dizziness and tiredness. Ruth also testified that if he would stand for longer than fifteen or twenty minutes his right leg would give out and cause him to fall. The vocational expert testified that, if Ruth's subjective complaints were credited, Ruth would be unable to work in a competitive setting.

The ALJ issued a decision denying benefits on January 30, 2003. In that opinion, the ALJ discounted Ruth's testimony regarding his level of impairment. She found that, while Ruth could not have returned to his former occupation, he retained the residual functional capacity to perform

a full range of light work during the relevant period.[1] The appeals council denied Ruth's request for review on October 18, 2005. Ruth commenced this action on December 13, 2005.

**III.**

In this judicial review, the Court must determine whether the ALJ's decision is supported by substantial evidence in the administrative record. 42 U.S.C. § 405(g). If supported by substantial evidence, the ALJ's findings must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422, 28 L. Ed. 2d 842 (1971); *Reynolds v. Chater*, 82 F.3d 254, 257 (8th Cir. 1996). Substantial evidence is more than a scintilla but less than a preponderance. It is such relevant evidence as a reasonable mind would find adequate to support a conclusion. *Richardson*, 402 U. S. at 401, 91 S. Ct. at 1427; *Reynolds*, 82 F.3d at 257. The Court must consider evidence that detracts from the ALJ's decision as well as evidence that supports it. The Court may not, however, reverse merely because substantial evidence would have supported an opposite decision. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Ruth contends that the ALJ improperly applied the factors outlined in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1994), when she discredited his subjective complaints of pain, dizziness, shortness of breath, leg dysfunction, and tiredness. Ruth argues that the ALJ improperly discounted his subjective complaints, including his allegations of disabling pain. An ALJ is required to state the inconsistencies in the objective medical evidence presented and to discuss the factors set forth in *Polaski* when making "credibility" determinations concerning claimants' subjective complaints. *Herbert v. Heckler*, 783 F.2d 128, 130 (8th Cir. 1986). An ALJ need not treat the factors cited in

---

[1] The ALJ also found, relying on testing of the vocational expert, that a significant number of jobs exist for persons with Ruth's age, education, and past work experience who have the residual functional capacity for light work. Ruth does not challenge that finding.

4

*Polaski* as a checklist or discuss each one in detail. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth."). However, "[w]hen an ALJ rejects a claimant's complaints of pain, he or she must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the *Polaski* factors." *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Here, the ALJ discussed the *Polaski* factors in evaluating Ruth's subjective complaints. Her opinion states:

> In assessing the claimant's medically determinable impairments and their impact on his ability to perform work functions, the Administrative Law Judge must consider the claimant's subjective allegations, Polaski v. Heckler, 739 F.2d 1320-1322, 751 F.2d 943, 948 (8th Cir. 1984). In evaluating subjective complaints, the undersigned must give careful consideration to all avenues presented that relate to such matters as:
>
> 1. The nature, location, onset, duration, frequency, radiation, and intensity of any pain;
>
> 2. Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);
>
> 3. Type, dosage, effectiveness, and adverse side-effects of any pain medication;
>
> 4. Treatment, other than medication, for relief of pain;
>
> 5. Functional restrictions; and
>
> 6. The claimant's daily activities[.]
>
> (20 C.F.R. §416.929).
>
> The Administrative Law Judge acknowledges that the claimant has alleged severe pain and symptoms to the extent that he is unable to work. These allegations have

been considered pursuant to the guidelines in Social Security Ruling 96-7p and Polaski v. Heckler, 751 F.2d 943 (8th Cir. 1984) (subsequent history omitted).

It must first be noted that the medical findings that are present are not consistent with the disabling level of pain alleged by the claimant. Certainly his allegations cannot be disregarded on this basis, but this is a factor which must be considered. The absence of objective medical findings to support allegations of disabling pain or other symptoms is one factor, which can be used to evaluate credibility. Black v. Apfel, 143 F.2d 383 (8th Cir. 1998)[.]

The claimant did not report any side effects from his medications. The claimant underwent physical therapy with reported good relief of discomfort (Exhibit 29).

The fact that he may have some level of discomfort was given due consideration in reaching the finding that he would be limited to light work.

With regard to aggravating factors and functional limitations, the claimant has alleged that he suffered from constant pain and was unable to work. However, it does not appear that any physician has placed this level of limitation upon the claimant. According to the testimony and Exhibit 17, his daily activities include taking care of his personal needs, performing yard work, gardening, paying bills, occasional shopping, reading, fishing, hunting, watching television, listening to the radio, reading and driving. Allegations of disabling pain may be discredited by evidence of daily activities inconsistent with alleged level of pain. Gray v. Apfel, 192 F.3d 799 (8th Cir. 1999)[.]

In the judgment of the Administrative Law Judge, the symptomatology suffered by the claimant is not of a duration, frequency or intensity as to be disabling nor would it preclude the performance of light work.

As functional restrictions, it is found that the claimant did not suffer from any restrictions, which would have prevented him from performing a full range of light work at any time prior to November 5, 1996.

The testimony of the claimant's wife, Gertie Ruth has also been considered. However, this testimony is based upon uncritical acceptance of the claimant's complaints and, to some degree, is motivated by the desire to see him obtain benefits. In view of these factors, and the previously discussed factors, this testimony is found not to be persuasive. Testimony of family members or friends must be given consideration, but that testimony need not be believed as credible. Lawrence v. Chater, 107 F.3d 674 (8th Cir. 1997)[.]

The Administrative Law Judge concludes that the claimant did retain the residual functional capacity for light work from July 15, 1992 through November 5, 1996.

R. at 299-300.

The decision of the ALJ is supported by substantial evidence.

It is undisputed that Ruth did not report any side effects from his medications. Moreover, during the period from July 15, 1992, through November 5, 1996, it does not appear that Ruth received any treatment, other than medication, for relief of pain. In his brief, Ruth refers to medical records dated December 15, 1987; October 24, 1988; March 29, 1989; January 28, 1992; and November 17, 1992. The only one of these records bearing a date within the relevant time is the one dated November 17, 1992. That record is a letter from Randall Green, Physical Therapist, to Dr. Charles Schock, an orthopedic surgeon with the Arkansas Back Clinic. That letter reported that Ruth underwent a functional capacity evaluation following re-injury of his back while working for the highway department. The re-injury reportedly occurred near the end of September or early October. Ruth "tested at the light physical demands level of work with consideration of material handling and static strength testing" with him "stopping all tests secondary to increased back pain." That document does not show that Ruth sought treatment, other than medication, for the pain. It does indicate that he was capable of performing light physical demands.

The ALJ correctly states that it does not appear that any physician placed any limitation on Ruth that would have prevented him from performing light work during the relevant period. In fact, on September 8, 1993, Dr. Schock, the orthopedic surgeon, stated in a letter to Dr. Jack Irvin, Ruth's primary care physician, "[I]t does not appear at this time that he is having enough trouble at light activity to justify any more intervention on our part." The letter noted that Ruth might require further intervention in the future and concluded that Ruth would return periodically "when he has been placed in a lighter job, and wishes to discuss his function in that setting with us." On April 15, 1994,

7

Dr. Schock again wrote Dr. Irvin and stated, "Earlie Ruth returns, feeling a little bit better. . . . Since he is feeling a little better, we will put off our plans to repeat his discogram and will place him on a weight loss program. He should be weighed when he returns in three months." On July 8, 1994, Dr. Schock wrote Dr. Irvin and stated:

> Earlie Ruth returns, having lost fourteen pounds. He feels somewhat better, and tells me that his workmen's comp checks have been cut off and that he is in a financial squeeze at present, and really desperately needs to pursue the vocational rehab option in order to get into lighter work that he can do. We will lend whatever aid we can to this process. Mr. Ruth feels pretty well during the day but has difficulty sleeping, hence we will give him Flexeril for HS use.

Ruth was to return in six months. On October 11, 1994, Dr. Schock wrote Dr. Irvin:

> Mr. Ruth returns, having bumped his foot while hunting and now apparently has some lymphangiitis and groin swelling for which he is on Ceclor. His calf and knee also have been swollen and are slightly tender today, hence, we will get a venous Doppler and see him back following this. He will continue on the Ceclor.

On November 8, 1994, Dr. Schock wrote Dr. Irvin as follows:

> Mr. Ruth returns, with his back feeling a little better and with his leg resolved on antibiotics. It appears to have been a low grade infection. The venous Doppler was negative. He is having a hearing in December regarding his disability status, and will make an appointment here following this if back symptoms necessitate. If he is no more symptomatic than he is now, I believe I would not do anything different. If he is more symptomatic, we may want to repeat the discogram and the MRI.

Thus, it appears from a review of Dr. Schock's letters to Dr. Irvin in 1993 and 1994 that Dr. Irvin thought that Ruth should be able to perform light work. In the fall of 1994, Ruth was able to go hunting, though he did bump his foot while hunting and as a consequence suffered some swelling.

> On August 25, 1995, Dr. Schock wrote:
>
> Mr. Ruth returns with increasing pain in his low back and buttocks made worse on prolonged sitting. This is typical of discogenic pain. He had a positive discogram at L5-S1 in 1992 and some relief following this. I believe that it would be worthwhile to repeat the MRI to see which of the disc [sic] is the site of degeneration and then to follow it with a discogram. We will see him back following the MRI.

8

On December 3, 1996, Dr. Schock wrote:

> Mr. Ruth returns after over a years [sic] absence. He is taking an occasional Ultram. Our original plan was to do an MRI of the lumbosachral spine and since he is still symptomatic now we will order this. We will see him back following the MRI.

On December 10, 1996, Dr. Schock wrote Dr. Irvin and stated:

> Mr. Ruth returns now about four years post discogram which was positive at L5-S1. An MRI was done which does not show much change from previous MRI's with severe disc degeneration at L5-S1 again. He does not feel he's doing badly enough at this point to require total diskectomy, posterolumbar interbody fusion and posterior fusion as we have discussed with him, and hence, we will continue to follow him conservatively. He will return in six months.

Thus, Dr. Schock's letters in 1993 and 1994 show that the plan throughout that period of time was for Ruth to do light work. In the summer of 1995, Ruth reported increasing pain and was to undergo an MRI but then did not return to Dr. Schock until December 1996. After an MRI was done in December 1996, the decision was made to continue with conservative treatment. These records as a whole are entirely consistent with the findings of the ALJ that Ruth did not suffer from any restrictions that would have prevented him from performing a full range of light work prior to November 5, 1996, that the objective medical findings do not support allegations of disabling pain, and that the symptoms that Ruth suffered were not of such a duration, frequency, or intensity as to be disabling or to preclude him from performing light work.

Furthermore, the medical evidence does not support Ruth's subjective complaints stemming from his high blood pressure. Ruth stated in his brief that his high blood pressure was "usually associated directly with the level of discomfort experienced in his back and legs when his pain [was] increased." He also testified that his high blood pressure led to dizziness, tiredness, and loss of balance. Yet, doctor's notes in the record reveal that beginning in 1982, when he was working and not experiencing back pain, Ruth suffered from high blood pressure as severe as what he experienced

9

during the period of alleged disability. Ruth cites records showing that his blood pressure was high on numerous dates, but all but one of these dates were outside the relevant period. On October 23, 1995, Ruth underwent a stress test. The summary was:

> Normal submaximal stress test. There was no evidence of ischemic heart disease. No symptoms of indicative of [sic] ischemic heart disease. The blood pressure was exaggerated and the patient was told to add Hydrochlorothiazide 25 mg. to his Calan, to get a potassium and blood pressure check in my office in one week and I will see him in one month.

Records not cited in Ruth's brief show blood pressure readings in 1995 and 1996 of 140/78, 140/92, 150/90, 140/80, 130/80, 140/80, 140/90, and 140/80. None of this is sufficient to show that Ruth was unable to perform light work. Thus, the ALJ could have reasonably concluded that the symptoms that Ruth experienced from his high blood pressure by themselves were not so severe as to prevent Ruth from working. *See Dixon v. Sullivan*, 905 F.2d 237, 238 (8th Cir. 1990).

The ALJ examined the evidence on the record of Ruth's functional limitations when weighing Ruth's credibility. She referenced a functional capacity evaluation performed in November 1992 that found Ruth capable of light work. As mentioned above, the ALJ noted that none of Ruth's doctors placed any functional restrictions on Ruth's ability to work that would have precluded light-duty work. Such a lack of functional restrictions undermines a claimant's subjective complaints. *See Dunahoo*, 241 F.3d at 1038-39 (ALJ properly considered lack of functional restrictions by claimant's doctors as evidence that claimant was not disabled); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993). The ALJ also considered Ruth's treatment in relation to his subjective allegations, mentioning that the notes from the physical therapy sessions Ruth attended report that the physical therapy was effective in reducing the pain. "Impairments that are controllable or

amenable to treatment do not support a finding of total disability." *Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999).

Finally, the ALJ determined that Ruth's self-reported limitations were inconsistent with the evidence of Ruth's daily activities in the record. Allegations of disabling pain may be properly discredited by evidence of daily activities inconsistent with such allegations. *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004). Exhibit 17 contains three disability supplemental interview outlines in which Ruth described his daily activities. He reported on November 29, 1993, that he did yard work, gardening, or bill paying two or three hours a day until he started hurting and his leg gave out. He reported that he went shopping once a month, that he read a newspaper daily, and that he would go fishing "now and then." He reported that he was able to drive but did not know whether he could drive on unfamiliar routes. On a second outline, Ruth reported that he walked a mile per day, washed dishes, cooked supper twice per month, sometimes cleaned house and washed laundry, went shopping twice per month, and went fishing or hunting once per month. The reports on the third outline are similar. The ability to drive short distances, read, and watch television are indicia that Ruth's pain does not interfere with his ability to concentrate. *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994). The ALJ also noted that Ruth did yard work and gardened, and he occasionally shopped, fished, and hunted. Such physically demanding tasks contradict Ruth's claim that he was unable to perform basic work activities. *Cf. Roe v. Chater*, 92 F.3d 672, 677 (8th Cir. 1996). Ruth argues that the ALJ in her opinion did not give a fair description of his activities of daily living as Ruth recorded them in disability supplemental interview outlines. Some of Ruth's answers on the outlines are consistent with his self-reported limitations; other answers are

inconsistent with each other.² Yet when all three outlines are viewed together – along with the other evidence in the record³ – they support the ALJ's description of Ruth's activities of daily living.

In addition to the ALJ's *Polaski* findings, the record contains other reasons to discount the credibility of Ruth's subjective complaints. Ruth testified that the medicine he took helped with the pain. That Ruth's pain could be controlled by medication suggests that it was not disabling. *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995). While Ruth testified that his pain medications did not "do away" with the pain, an individual does not have to be entirely pain free to engage in work activity. *See Rankin v. Apfel*, 195 F.3d 427, 429 (8th Cir. 1999). Ruth also testified that he looked for a job during the time period he claims disability and that he believed he could work at the time. That testimony tends to undermine Ruth's assertion that his impairments were disabling. *Cf. Naber v. Shalal*, 22 F.3d 186, 188 (8th Cir. 1994). Lastly, the fact that Ruth asked Dr. Simpson in September 1989 if he could get on Social Security disability – despite being released to go back to work – undermines the credibility of Ruth's subjective complaints.

Viewing the evidence on the record as a whole, the Court cannot say that the decision of the ALJ is unsupported by substantial evidence or infected with legal error.

---

² For instance, on one of the outlines Ruth checked the box "yes" for "do you drive," but then wrote, "Because of my back and the pain I can't drive."

³ One example is Dr. Schock's clinical note dated October 11, 1994, where Schock recorded that Ruth had injured his foot while hunting. That note and the interview outline contradict Ruth's testimony at the 2000 administrative hearing that he quit hunting right after his first back surgery in 1989.

## CONCLUSION

The ALJ's determination that Ruth can perform other substantial and gainful work within the economy is supported by substantial evidence on the record as a whole. The ALJ's decision is AFFIRMED.

IT IS SO ORDERED this 16th day of March, 2007.

J. LEON HOLMES
UNITED STATES DISTRICT JUDGE